IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**

STATE V. BURGER

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

STATE OF NEBRASKA, APPELLEE,

V.

MARSHALL D. BURGER, APPELLANT.

Filed June 18, 2019.    Nos. A-18-1036 through A-18-1039.

Appeals from the District Court for Gage County: RICKY A. SCHREINER, Judge. Affirmed.

Timothy S. Noerrlinger for appellant.

Douglas J. Peterson, Attorney General, and Jordan Osborne for appellee.

MOORE, Chief Judge, and RIEDMANN and BISHOP, Judges.

MOORE, Chief Judge.

### INTRODUCTION

Marshall D. Burger appeals from his plea-based convictions in four cases, cases Nos. A-18-1039 (the burglary/first revocation case), A-18-1038 (the theft/second revocation case), A-18-1037 (the first 2018 case), and A-18-1036 (the second 2018 case), in the district court for Gage County. The revocation cases arise from motions filed by the State of Nebraska, seeking to revoke the terms of postrelease supervision Burger was serving for his convictions for attempted burglary and theft committed in 2016. The motions were filed after Burger committed additional thefts in 2018 that led to the charges in the 2018 cases. In all four appeals, Burger asserts that the court imposed excessive sentences. He also asserts that he received ineffective assistance of trial counsel. Upon our review, we find the record inadequate to address two of Burger's assertions regarding ineffective assistance of counsel; his other assertion fails for the reasons discussed herein. Additionally, we find that Burger's sentences in these cases were not excessive.

- 1 -

*Sentences Imposed for 2016 Crimes.*

On June 1, 2017, Burger was sentenced for his plea-based convictions in the burglary and theft cases underlying the current revocation cases. For attempted burglary, a Class III felony, the district court sentenced Burger to 90 days in jail with no credit for time served and 2 years' postrelease supervision. For theft by taking (value of more than $1,500 but less than $5,000), a Class IV felony, the court sentenced Burger to 180 days in jail with credit for 102 days' time served and 12 months' postrelease supervision. The court ordered that Burger serve the sentence in the theft/second revocation case consecutively to the sentence imposed the burglary/first revocation case. Burger began his period of postrelease supervision on July 18.

*Period of Postrelease Supervision.*

While on postrelease supervision, Burger tested positive for marijuana 12 times, had 13 unexcused absences from testing, and had 10 administrative sanctions issued against him. In the burglary/first revocation case, Burger had custodial sanctions imposed on four separate occasions, and he served a total of 48 days in jail. In the theft/second revocation case, Burger had custodial sanctions imposed twice, and he served a total of 16 days in jail.

On July 9, 2018, the State file motions to revoke Burger's postrelease supervision in both cases, alleging that Burger's arrest in May for two counts of theft by unlawful taking and one count of driving under suspension had violated the terms of his orders for postrelease supervision.

*First 2018 Case and Plea Hearing.*

The first 2018 case was initiated on June 21, 2018, when the State filed an information in the district court, charging Burger with theft by taking (value more than $5,000), in violation of Neb. Rev. Stat. § 28-511 (Reissue 2016), a Class IIA felony; second offense theft by taking (value of $500 or less), in violation of § 28-511, a Class I misdemeanor; and driving under suspension, in violation of Neb. Rev. Stat. § 60-4,108(2) (Cum. Supp. 2018), a Class III misdemeanor.

On August 2, 2018, a plea hearing was held before the district court, addressing Burger's pleas in the first 2018 case and both revocation cases. In exchange for Burger's admissions to violating the terms of his postrelease supervision in both of the revocation cases and his plea of no contest in the first 2018 case, the State reduced the first count in the first 2018 case to a charge of attempted theft by taking (value more than $5,000), a Class IIIA felony. The State filed a corresponding amended information in the first 2018 case.

During the August 2018 plea hearing, the district court advised Burger of the allegations in the revocation cases, his rights, and the possible dispositions if he was found to have violated the terms and conditions of his postrelease supervision, and Burger indicated his understanding of the court's advisement. Burger then informed the court that he wished to admit to the allegations in both revocation cases.

Before accepting Burger's admissions in the revocation cases, the district court questioned him further. The court asked Burger his name, age, and level of education and inquired about his consumption of alcohol and drugs in the preceding 24 hours. Burger informed the court that he

had not consumed any alcohol or consumed, ingested, or inhaled any drugs in that period. He also informed the court that he was not experiencing any confusion and that he believed he understood the court proceedings. Finally, he affirmed his understanding that if he admitted to the violations of his postrelease supervision, there would be no trial, and he informed the court that no one had threatened him or made promises other than those found in the plea agreement to get him to admit to the allegations. The State provided a factual basis, indicating that the terms of Burger's postrelease supervision in both revocation cases required him to obey "the laws of any state" and that in May 2018 Burger had been arrested for two counts of alleged theft and one count of alleged driving under suspension in Gage County. The court found that Burger had waived his rights and entered his admissions freely, voluntarily, knowingly, and intelligently. The court accepted his admissions, and it found that he did violate the terms of his postrelease supervision in both revocation cases. The court also ordered a presentence investigation (PSI).

Next, the district court advised Burger of the nature of the charges to which he was pleading in the first 2018 case and the possible penalties for those charges. Burger indicated his understanding of the court's advisement as well as his understanding of the various constitutional rights he would be waiving by pleading to the amended information. Burger informed the court that he had had enough time to talk to his attorney about the first 2018 case, had told his attorney everything he knew about the case, had discussed all possible defenses with his attorney, and was satisfied with the job his attorney had done for him. Burger then entered pleas of no contest to each charge of the amended information.

According to the factual basis provided by the State for the first 2018 case, while Burger was on postrelease supervision in the revocation cases, police investigated reports of two vehicles that were stolen during the overnight hours of May 5 and 6, 2018. After a car was stolen from a location in Beatrice, Nebraska and a vehicle accident was reported, the car was recovered with damage related to the accident. Additionally, a pickup with a missing tailgate was reported stolen approximately one block away from where the damaged car was left. Police reviewed a video showing a man walking in the area between where the car was recovered and the pickup was stolen. Based on previous contacts, an officer suspected the man was Burger.

Police were also advised about a missing tablet computer taken from the parking lot of the location where the car was stolen during the same period. The owner of the tablet was able to map the tablet's location over the course of the period since it was stolen. Police located the stolen tablet and spoke with the person in possession of it, who advised them that Burger had given it to her a few hours earlier and had wanted her to sell it. The mapped locations of the tablet during the period in question matched locations relevant to the vehicle thefts and Burger's residence. The woman who was in possession of the tablet when it was recovered positively identified Burger in the video previously reviewed by police.

Police then contacted Burger and advised him of his *Miranda* rights. After providing several contradicting statements, Burger admitted that he knew where the stolen pickup was located, took an officer to its location, and told the officer where to find the keys. When asked about the car, Burger advised that "they" were driving it prior to Burger being in the car and that was when "they" got into the accident. The total value of the two stolen vehicles was $5,992, and

- 3 -

the value of the tablet was under $500. A records check showed that Burger's driver's license was suspended as of January 2017 with no eligibility date.

The district court then found that Burger had waived his rights and entered his no contest pleas in the first 2018 case freely, voluntarily, knowingly, and intelligently. The court accepted Burger's pleas and found him guilty beyond a reasonable doubt of the counts in the amended information in the first 2018 case, and it ordered a PSI in that case as well. Before the close of the hearing, Burger also admitted that the second count of the amended information was a second offense for purposes of enhancement and waived a separate hearing on that issue.

*Second 2018 Case and Plea Hearing.*

Burger committed additional vehicle thefts in July and August 2018 that led to the charges in the second 2018 case. On September 18, 2018, the State filed an information in the district court, charging Burger with theft by taking (value more than $5,000), in violation of § 28-511, a Class IIA felony; theft by taking (value of $1,500 or more, but less than $5,000), in violation of § 28-511, a Class IV felony; and driving under suspension, in violation of § 60-4,108(2), a Class III misdemeanor.

A plea hearing in the second 2018 case was held before the district court on September 20, 2018. In exchange for Burger's pleas of no contest, the first charge in that case was reduced to attempted theft by taking (value more than $5,000), a Class IIIA felony and the third count of the original information was dismissed. The State filed a corresponding amended information in the second 2018 case.

During the hearing, the district court questioned Burger to "determine how well [he] underst[oo]d the proceedings." The court asked Burger about his age, education, and employment history, as well as his recent consumption of any drugs or alcohol. Burger informed the court that he had not consumed any alcohol or legal or illegal drugs within the preceding 24 hours; however, he did inform the court that he was taking certain prescription medication. Specifically, he told the court he was taking "Clonidine for mental" and "something generic for Abilify." He had taken these medications the night before the hearing, when he was supposed to take them, and informed the court that the Clonidine was not affecting his ability to understand or make decisions. The court did not ask Burger about the effect of the other medication. Burger told the court that he was not currently under the care of a psychiatrist or psychologist. At the end of this questioning, the court determined that Burger was following its questions and giving suitable answers and that his "eyes, speech and bearing" appeared "to be normal." Accordingly, the court concluded that Burger was not then affected by alcohol, narcotics, or other controlled substances.

The district court then advised Burger of the rights he would be waiving by entering his pleas, as well as the nature of the charges in the amended information in the second 2018 case and the possible penalties, and Burger indicated his understanding of the court's advisement. Burger also informed the court he had discussed all defenses with his attorney, had told his attorney everything he knew about the second 2018 case, and had had enough time to discuss the case and was satisfied with his attorney's representation in that case. Following this discussion, Burger entered no contest pleas to the charges in the amended information in the second 2018 case.

According to the factual basis provided by the State for the second 2018 case, police were advised about certain stolen vehicles: a van worth around $2,825, stolen in late July, and a pickup worth about $2,000 and a trailer worth about $2,000, both stolen in early August. On July 29, police were dispatched to the location where the van was found. On August 6, the pickup was located in a parking garage in Beatrice, Nebraska, but because the keys were missing, it had to remain where it was. A cell phone was seized from the pickup because it did not belong to the owner of the pickup. On August 7, the same pickup was found in a different location in Beatrice and a witness recognized the driver as Burger. Police then contacted Burger and advised him of his *Miranda* rights. Burger admitted to stealing the van and parking it; he also admitted to stealing the pickup and trailer and taking them to Lincoln, Nebraska. He also admitted to leaving the trailer at a location in Lincoln before returning to Beatrice where he parked the pickup in the first location where it was found, leaving behind the cell phone. Burger told police that he returned later and stole the pickup again, leaving it where it was found the second time. Beatrice police contacted Lincoln police officers, who then located the trailer at the location specified by Burger.

The district court accepted Burger's no contest pleas as being made freely, voluntarily, knowingly, and intelligently; found sufficient facts to find him guilty of the charges in the amended information in the second 2018 case; and continued the previously scheduled sentencing hearing for the other three cases to allow more time to review the PSI, given the fourth case under consideration.

*Sentencing.*

A sentencing hearing in all four cases was held on October 5, 2018. After hearing argument from the parties and allocution from Burger, the district court stated:

THE COURT: Mr. Burger, [your attorney] is correct, and I think in this courtroom over and over I've tried to put people on probation who are nonviolent, because the prison system is a violent system right now, and those people that society needs protection from belong in prison if they are convicted.

If they are -- I try to focus on those people who are physically dangerous who have caused harm. Otherwise, I trust our probation system and the work that they have done and they continue to do in trying to solve a problem. You do have a problem. You can't keep your hands off other people's stuff, and we have tried probation.

We had a criminal trespass . . . in [j]uvenile [c]ourt in 20[08], a criminal mischief, unauthorized use of a propelled vehicle in 2014. They tried a fine in that case. There's an amended to disturbing the peace and then in 2014, you had a theft by receiving stolen property. They tried probation in that case, and your probation was revoked and you were sentenced to county jail for 30 days to resolve that matter.

In 2016, you had another attempt of a Class II misdemeanor. You had another fine. I guess they were going to try the fine again and see if that made a difference. In 2017, possession of controlled substance. The prosecution was declined in that. Your attorney has [al]luded to some type of substance abuse problem that may be causing you some issues, and then we have in 2018 . . . . this case -- and then the revocation of post-release supervision. You may have a substance abuse problem that is causing you problems, but

- 5 -

it's causing the community more problems than it's causing you. Because people's vehicles continue to come up missing, and in this case, in two of these cases, we got county time -- is that right?

DEFENDANT: Yes, Your Honor.

THE COURT: And then put on post-release supervision.

THE COURT: And you were on post-release supervision, which was probation monitoring to help you not break any more laws, and now we have got two more cases where you are breaking laws. So you, Mr. Burger, with four cases all involving the same thing, apparently, county jail, fines, and probation, aren't working to change your behavior. The only thing that we haven't tried is prison. And that's where you are going today.

In the revocation cases, the district court revoked Burger's postrelease supervision and ordered him imprisoned for the remainder of his terms of postrelease supervision, which was 286 days (with 48 days' credit for time spent in custodial sanctions) in the first revocation case and 365 days (with 16 days' credit for time served in custodial sanctions) in the second revocation case. The court ordered that Burger serve the term of imprisonment for the second revocation case consecutive to the term in the first revocation case.

In sentencing Burger for his convictions in the two 2018 cases, the district court stated that it had considered all of the factors in Neb. Rev. Stat. § 29-2260 (Reissue 2016) and determined that probation was not appropriate. In the first 2018 case, the court sentenced Burger to imprisonment for a term of 2 years for attempted theft, a concurrent term of 1 year for theft, and a concurrent term of 3 months for driving under suspension. The court gave Burger credit for 26 days' time served in the first 2018 case, and ordered that the concurrent sentences in that case run consecutive to the consecutive sentences imposed in the revocation cases. The court also imposed a period of 18 months' postrelease supervision in the first 2018 case. In the second 2018 case, the court imposed concurrent sentences of 2 years' imprisonment on both counts with credit for 59 days of time served. The court ordered that the sentences in the second 2018 case be consecutive to the terms imposed in the revocation cases but concurrent with the sentence imposed in the first 2018 case. The court also ordered Burger to serve a period of 18 months' postrelease supervision in the second 2018 case to run concurrent with the postrelease supervision period imposed in the first 2018 case.

Burger subsequently perfected his appeals to this court.

## ASSIGNMENTS OF ERROR

In all four cases, Burger asserts that (1) the sentences imposed were excessive and constituted an abuse of discretion and (2) he received ineffective assistance of trial counsel.

## STANDARD OF REVIEW

An appellate court will not disturb a sentence imposed within the statutory limits absent an abuse of discretion by the trial court. *State v. Mrza*, 302 Neb. 931, 926 N.W.2d 79 (2019). Whether probation or incarceration is ordered is a choice within the discretion of the trial court, whose judgment denying probation will be upheld in the absence of an abuse of discretion. *State v.*

*Cerritos-Valdez*, 295 Neb. 563, 889 N.W.2d 605 (2017). An abuse of discretion occurs when a trial court's decision is based upon reasons that are untenable or unreasonable or if its action is clearly against justice or conscience, reason, and evidence. *State v. Gibson*, 302 Neb. 833, 925 N.W.2d 678 (2019).

Whether a claim of ineffective assistance of trial counsel can be determined on direct appeal presents a question of law, which turns upon the sufficiency of the record to address the claim without an evidentiary hearing or whether the claim rests solely on the interpretation of a statute or constitutional requirement. *State v. Garcia*, 302 Neb. 406, 923 N.W.2d 725 (2019). An appellate court determines as a matter of law whether the record conclusively shows that (1) a defense counsel's performance was deficient or (2) a defendant was or was not prejudiced by a defense counsel's alleged deficient performance. *Id.*

ANALYSIS

*Excessive Sentences.*

Burger first asserts that the district court abused its discretion by imposing excessive sentences in all four cases.

In each of the revocation cases, the district court sentenced Burger to imprisonment for the remaining period of postrelease supervision, which was 286 days in the first revocation case and 365 days in the second case, to be served consecutively. The court did not abuse its discretion in doing so.

With respect to revocation of postrelease supervision, Neb. Rev. Stat. § 29-2268(2) (Reissue 2016) provides, "If the court finds that a probationer serving a term of post-release supervision did violate a condition of his or her post-release supervision, it may revoke the post-release supervision and impose on the offender a term of imprisonment up to the remaining period of post-release supervision." Because a court has discretion under § 29-2268(2) to impose, upon revocation, any term of imprisonment up to the remaining period of postrelease supervision, an appellate court will not disturb that decision absent an abuse of discretion. *State v. Phillips*, 302 Neb. 686, 924 N.W.2d 699 (2019). The district court did not abuse its discretion by imposing terms of imprisonment up to the remaining periods of postrelease supervision in the revocation cases.

In the first 2018 case, Burger was convicted of attempted theft by taking (value more than $5,000), a Class IIIA felony, and sentenced to imprisonment for 2 years; theft by taking (value of $500 or less), 2d offense, a Class I misdemeanor, and sentenced to imprisonment for 1 year; and driving under suspension, a Class III misdemeanor, and sentenced to imprisonment for 3 months. Neb. Rev. Stat. § 28-518 (Reissue 2016); Neb. Rev. Stat. § 28-201 (Cum. Supp. 2018); § 60-4,108(2). The court imposed these sentences to run concurrently, but ordered that they be served consecutively to the sentences in the revocation cases. The court also imposed a period of 18 months' postrelease supervision. In the second 2018 case, Burger was convicted of attempted theft by taking (value more than $5,000) and theft by taking (value of $1,500 or more, but less than $5,000), both Class IIIA felonies, and sentenced to concurrent terms of 2 years' imprisonment followed by 18 months' postrelease supervision. § 28-518. The court ordered that these concurrent sentences be served consecutively to the sentences in the revocation cases but concurrent with the sentence in the first 2018 case. Class IIIA felonies are punishable by up to 3 years' imprisonment

and 18 months' postrelease supervision, a $ 10,000 fine, or both; there is no minimum term of imprisonment, but there is a minimum of 9 months' postrelease supervision if imprisonment is imposed. Neb. Rev. Stat. § 28-105 (Cum. Supp. 2018). Class I misdemeanors are punishable by up to 1 year imprisonment, a $ 1,000 fine, or both; there is no minimum term of imprisonment. Neb. Rev. Stat. § 28-106 (Reissue 2016). Class III misdemeanors are punishable by up to 3 months' imprisonment, a $500 fine, or both; there is no minimum term of imprisonment. § 28-106. Thus, Burger's sentences in the 2018 cases were within the statutory limits.

Where a sentence imposed within the statutory limits is alleged on appeal to be excessive, the appellate court must determine whether a sentencing court abused its discretion in considering and applying the relevant factors as well as any applicable legal principles in determining the sentence to be imposed. *State v. Garcia*, 302 Neb. 406, 923 N.W.2d 725 (2019). In determining a sentence to be imposed, relevant factors customarily considered and applied are the defendant's (1) age, (2) mentality, (3) education and experience, (4) social and cultural background, (5) past criminal record or record of law-abiding conduct, and (6) motivation for the offense, as well as (7) the nature of the offense and (8) the amount of violence involved in the commission of the crime. *Id.* However, the sentencing court is not limited in its discretion to any mathematically applied set of factors. *State v. Gibson*, 302 Neb. 833, 925 N.W.2d 678 (2019). The appropriateness of a sentence is necessarily a subjective judgment and includes the sentencing judge's observation of the defendant's demeanor and attitude and all the facts and circumstances surrounding the defendant's life. *State v. Garcia, supra*.

Burger acknowledges that the sentences imposed in all of the cases on appeal were within the statutory limits, but he argues that the court abused its discretion by sentencing him to lengthy imprisonment rather than imposing probation or lesser periods of incarceration.

Factors listed in § 29-2260(3) to be considered by a court when considering whether to withhold a sentence of imprisonment and grant probation, include:

    (a) The crime neither caused nor threatened serious harm;

    (b) The offender did not contemplate that his or her crime would cause or threaten serious harm;

    (c) The offender acted under strong provocation;

    (d) Substantial grounds were present tending to excuse or justify the crime, though failing to establish a defense;

    (e) The victim of the crime induced or facilitated commission of the crime;

    (f) The offender has compensated or will compensate the victim of his or her crime for the damage or injury the victim sustained;

    (g) The offender has no history of prior delinquency or criminal activity and has led a law-abiding life for a substantial period of time before the commission of the crime;

    (h) The crime was the result of circumstances unlikely to recur;

    (i) The character and attitudes of the offender indicate that he or she is unlikely to commit another crime;

    (j) The offender is likely to respond affirmatively to probationary treatment; and

    (k) Imprisonment of the offender would entail excessive hardship to his or her dependents.

In these cases, the record indicates that the district court carefully considered relevant factors and did not abuse its discretion in either declining to impose probation or in the length of imprisonment imposed. Burger was 22 years old at the time of sentencing, had a high school education, and was unemployed and on disability. In terms of criminal history, Burger had a juvenile adjudication for criminal mischief for which he received and successfully completed probation. As an adult, Burger was previously convicted of criminal mischief, disturbing the peace, misdemeanor theft by receiving stolen property, and criminal trespass. As an adult, he has previously been fined, sentenced to probation (which was revoked), or received jail sentences. Burger had received Social Security disability payments since graduating high school due to "ADHD, Bipolar Disorder and depression." He advised the probation officer conducting the PSI that he attempted to work for a construction company for 2 weeks but was unable to complete the work required due to his mental health condition.

As part of the PSI, Burger completed various substance use assessments: he scored in the moderate to high risk range for substance abuse on the Simple Screening Instrument; on the Substance Abuse Questionnaire he scored in the medium risk range on the truthfulness and stress coping scales, the problem risk range on the aggressiveness scale, and the maximum risk range on the drugs, violence, and antisocial scales. On the level of service/case management inventory Burger scored as a high risk for recidivism in the criminal history, leisure/recreation, antisocial pattern domains and as medium risk in the companions, alcohol/drug problem, and procriminal attitude/orientation domains. Due to "the seriousness of this offense and the defendant having a prior term of Probation revoked," the probation officer recommended "a short term of incarceration" and the imposition of various conditions with any term of postrelease supervision.

Burger argues that the district court fashioned sentences to fit the crimes rather than him as a defendant and that the court placed too much emphasis on his prior criminal history. We disagree. The court clearly considered the relevant sentencing factors, and in reciting Burger's criminal history at the hearing, it was specifically taking note of what sentences had been imposed previously, which had not deterred Burger from further criminal activity, particularly thefts. In other words, the court tailored the sentences in this case to the crimes at issue, the protection of the public, and the particular inclinations of this defendant. Given the failure of previous lesser sentences to deter Burger's criminal activity, the court declined to award probation and imposed sentences of incarceration.

Based upon the record before us, we find no abuse of discretion in the imposition of sentences of incarceration rather than probation, the length of the sentences imposed, or in the decision to impose certain sentences consecutively rather than concurrently.

*Ineffective Assistance of Trial Counsel.*

Burger asserts that he received ineffective assistance of trial counsel in various regards. He is represented on direct appeal by different counsel than trial counsel. When a defendant's trial counsel is different from his or her counsel on direct appeal, the defendant must raise on direct appeal any issue of trial counsel's ineffective performance which is known to the defendant or is apparent from the record, otherwise, the issue will be procedurally barred in a subsequent postconviction proceeding. *State v. Mrza*, 302 Neb. 931, 926 N.W.2d 79 (2019). The fact that an

ineffective assistance of counsel claim is raised on direct appeal does not necessarily mean that it can be resolved. *Id.* The determining factor is whether the record is sufficient to adequately review the question. *Id.*

Appellate courts have generally reached ineffective assistance of counsel claims on direct appeal only in those instances where it was clear from the record that such claims were without merit, or in the rare case where trial counsel's error was so egregious and resulted in such a high level of prejudice that no tactic or strategy could overcome the effect of the error, which effect was a fundamentally unfair trial. *State v. Sundquist*, 301 Neb. 1006, 921 N.W.2d 131 (2019). An ineffective assistance of counsel claim will not be addressed on direct appeal if it requires an evidentiary hearing. *State v. Chairez*, 302 Neb. 731, 924 N.W.2d 725 (2019).

When an ineffective assistance of counsel claim is raised in a direct appeal, the appellant is not required to allege prejudice; however, an appellant must make specific allegations of the conduct that he or she claims constitutes deficient performance by trial counsel. *State v. Sundquist, supra*. General allegations that trial counsel performed deficiently or that trial counsel was ineffective are insufficient to raise an ineffective assistance claim on direct appeal and thereby preserve the issue for later review. *Id.* An ineffective assistance of counsel claim is raised on direct appeal when the claim alleges deficient performance with enough particularity for (1) an appellate court to make a determination of whether the claim can be decided upon the trial record and (2) a district court later reviewing a petition for postconviction relief to recognize whether the claim was brought before the appellate court. *State v. Garcia*, 302 Neb. 406, 923 N.W.2d 725 (2019). An ineffective assistance of counsel claim made on direct appeal can be found to be without merit if the record establishes that trial counsel's performance was not deficient or that the appellant could not establish prejudice. *State v. Spang,* 302 Neb. 285, 923 N.W.2d 59 (2019).

Generally, to prevail on a claim of ineffective assistance of counsel under *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984), the defendant must show that his or her counsel's performance was deficient and that this deficient performance actually prejudiced the defendant's defense. *State v. Mrza, supra*. To show that counsel's performance was deficient, a defendant must show that counsel's performance did not equal that of a lawyer with ordinary training and skill in criminal law. *Id.* When a conviction is based upon a guilty or no contest plea, the prejudice requirement for an ineffective assistance of counsel claim is satisfied if the defendant shows a reasonable probability that but for the errors of counsel, the defendant would have insisted on going to trial rather than pleading guilty or no contest. *State v. Barrera-Garrido*, 296 Neb. 647, 895 N.W.2d 661 (2017). A reasonable probability is a probability sufficient to undermine confidence in the outcome. *State v. Mrza*, 302 Neb. 931, 926 N.W.2d 79 (2019). The two prongs of the ineffective assistance of counsel test under *Strickland v. Washington, supra*, may be addressed in either order, and the entire ineffectiveness analysis should be viewed with a strong presumption that counsel's actions were reasonable. *State v. Taylor*, 300 Neb. 629, 915 N.W.2d 568 (2018).

Burger first argues that his trial counsel was ineffective for failing to file a motion to contest his competency to stand trial. In support of his argument, he refers to several instances of confused behavior. He asserts that members of his family recall several instances during the pendency of this case where his behavior or responses seemed confused when he was conversing with his trial

counsel. He argues that this indicates he was struggling with understanding the nature of the proceedings, comprehending his own condition, and that he was unable to assist his attorney in making a rational defense. Burger also asserts that more than a month after he was sentenced, his appellate counsel observed him displaying concerning behavior where Burger indicated a basic lack of understanding about his sentence or the appellate process. Although the record on appeal does not include evidence of these instances of alleged confusion, the record from Burger's plea hearings is sufficient to address this claim on direct appeal.

A person is competent to plead or stand trial if he or she has the capacity to understand the nature and object of the proceedings against him or her, to comprehend his or her own condition in reference to such proceedings, and to make a rational defense. *State v. Garcia*, 302 Neb. 406, 923 N.W.2d 725 (2019). The test of mental capacity to plead is the same as that required to stand trial. *State v. Hessler*, 295 Neb. 70, 886 N.W.2d 280 (2016). In order to demonstrate prejudice from counsel's failure to investigate competency and for failing to seek a competency hearing, the defendant must demonstrate that there is a reasonable probability that he or she was, in fact, incompetent and that the trial court would have found him or her incompetent had a competency hearing been conducted. *Id.*

Here, Burger's responses to questions from the district court during the plea colloquies at both the August and September 2018 plea hearings were appropriate and reflected his knowledge that he was appearing in court for the purpose of no contest and/or guilty pleas and that he understood the consequences of such actions as they were explained to him by the judge.

At the August 2018 hearing, in response to the court's inquiries, Burger indicated that he understood the plea agreement, the nature of the violations alleged, his various rights, and the possible dispositions in the revocation cases. At that point in the hearing, an attorney had only been appointed to represent him in the first 2018 case. The court granted Burger's request to have the same attorney appointed to represent him in the revocation cases, after which Burger informed the court that he wished to admit the allegations in the revocation cases. Next, the court asked Burger a series of questions relevant to his competency to enter admissions and no contest pleas. In response to these questions, Burger advised the court of his age and educational level and told the court he had not consumed any alcohol or drugs in the preceding 24 hours. He also told the court that he was not then experiencing any confusion, that he believed he understood the court proceedings, and that he understood that his admission to the allegations in the revocation cases meant there would be no trial and the State would not have to prove he violated his postrelease supervision. After the State established a factual basis for the revocation cases, the court found that Burger understood the consequences of admitting to the allegations and his rights and that he was waiving those rights and his admissions in the revocation cases freely, voluntarily, knowingly, and intelligently. A similar exchange of questions and answers between Burger and the court took place during the portion of the August plea hearing devoted to the first 2018 case. Burger again indicated he understood the terms of the plea agreement, the nature of the charges and possible penalties in the first 2018 case, his various rights, and the consequences of waiving his rights and entering no contest pleas. He informed the court that he had had sufficient time to discuss the case with his attorney and was satisfied with the job his attorney had done. The court found that Burger fully understood the charges, the possible penalties, and his rights and that he was waiving those

rights and entering his no contest pleas in the first 2018 case freely, voluntarily, knowingly, and intelligently.

A similar plea colloquy occurred during the September 2018 hearing where Burger entered no contest pleas in the second 2018 case. As with the previous plea hearing, Burger's responses to the district court's advisements and inquiries were appropriate and reflected his knowledge that he was appearing to enter no contest pleas and that he understood the consequences of doing so. The court again asked Burger questions to determine how well he understood the proceedings. In response, Burger provided his name, age, and educational level, all of which were consistent with the responses he provided during the previous hearing. He also told the court about his unemployment status, receipt of disability payments, and the last time he had been employed. He informed the court that he had not consumed any alcohol or drugs (other than certain prescription drugs he discussed with the court) in the preceding 24 hours. With respect to the prescription drugs he was taking, Burger informed the court that he had taken them the night before, as prescribed, and that one of the drugs (about which the court inquired) was not affecting his ability to make decisions or understand the court proceedings. He also informed the court that he was not under the care of a psychiatrist or psychologist. At the conclusion of this exchange, the court noted that Burger was following the court's questions, providing suitable answers, and appeared "to be normal" physically in terms of "his eyes, speech and bearing." The court concluded that Burger was not at that time affected by alcohol, narcotics or other controlled substances. The court then proceeded with the balance of the plea hearing in the second 2018 case, and the record reflects Burger's appropriate responses to the court's additional inquiries and advisements.

In sum, the record does not demonstrate that Burger's trial counsel was ineffective for failing to investigate his competency or for failing to seek a competency hearing.

Next, Burger argues that his trial counsel was ineffective for failing to file a motion to suppress his statements made on May 6 and August 7, 2018, to officers of the Beatrice Police Department. Burger claims he was under the influence of alcohol and marijuana at the time he was interviewed by officers on May 6 in connection with the first 2018 case and that his trial counsel performed deficiently by failing to schedule depositions of the specific officers who interviewed him to determine the exact nature of the signs of intoxication he was showing at the time and by failing to file a motion to suppress Burger's statement. Burger makes similar allegations about his counsel's failures with respect to Burger's interview by a third police officer after his arrest on August 7 in the second 2018 case, although in connection with that interview Burger only claims that he advised his attorney that he was under the influence of alcohol at the time of that interview. The State asserts that the record affirmatively disproves Burger's claims to be under the influence of at least alcohol at the time of either of these statements, given his statements to the probation officer during the PSI that he has not consumed alcohol since January 2017. The State otherwise acknowledges that the record is insufficient to review this claim on direct appeal. Burger's statements to the probation officer at the time of the PSI do not reveal anything about what he told his attorney prior to the plea hearings in these cases about being under the influence of alcohol and/or marijuana at the time of his police interviews. Burger's second and third claims of ineffective assistance of trial counsel involve discussions between Burger and his attorney, as well as his attorney's strategic decisions about whether to file any suppression motions. Since these

conversations are not part of the record, the record is insufficient to address these claims on direct appeal.

## CONCLUSION

The district court did not abuse its discretion in sentencing Burger. The record on direct appeal is insufficient to address two of Burger's claims of ineffective assistance of trial counsel; his other claim fails for the reasons discussed above.

AFFIRMED.